In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1373

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANGELICA VASQUEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 866—**Ronald A. Guzman**, *Judge.*

ARGUED OCTOBER 31, 2011—DECIDED MARCH 12, 2012

Before KANNE and WILLIAMS, *Circuit Judges*, and
DEGUILIO, *District Judge.*[*]

KANNE, *Circuit Judge.* For approximately seven years,
Angelica Vasquez aided undocumented immigrants in
filing claims for Illinois unemployment benefits. Vasquez
charged an $80 fee to prepare and submit applications

_____

[*] The Honorable Jon E. DeGuilio, United States District Court
for the Northern District of Indiana, sitting by designation.

on behalf of these aliens to the Illinois Department of Employment Security ("IDES"). The social security numbers of unsuspecting, law-abiding citizens were unlawfully used to apply for benefits. Vasquez arranged with an IDES employee to process the applications she submitted as though the undocumented aliens were United States citizens. For her services, Vasquez also received a subsequent payment of one benefits check from each of the claimants.

A jury convicted Vasquez of eight counts of mail fraud on June 17, 2010, and she was sentenced to 96 months' imprisonment. At the sentencing hearing, defense counsel did not object to the presentence investigation report (PSR), which applied four sentencing guideline enhancements to Vasquez's sentence. Vasquez now argues on appeal that three of these enhancements were applied in error. Because we find that the district court did not commit plain error in applying the enhancements set forth in the PSR, we affirm.

## I. BACKGROUND

IDES administers Illinois's unemployment insurance program, which provides income for individuals who are unemployed through no fault of their own. Eligible individuals must have earned a certain amount of wages in their prior job and be actively seeking employment. Although claimants need not be Illinois residents, they must be United States citizens or authorized to work in the United States.

To apply for benefits, an unemployed individual completes an application at a local office or online. The application asks for information including the claimant's name, address, date of birth, last date of employment, employer, spouse's social security number, and existence of dependent children. In addition, a claimant must answer a series of eligibility questions. After completing the form, a claimant must provide his signature, certifying that the information is true and accurate. The claimant must also produce two forms of identification, one of which must include his social security number. The claimant's social security number is necessary because employers report this number to IDES.

One question on the unemployment insurance application asks if the applicant is a United States citizen. If a claimant answers in the affirmative, IDES does not ask for proof of citizenship, instead relying on the claimant's certification that the information is true and accurate. If the claimant responds that he is not a citizen but has authorization to work in the United States, IDES requests his alien registration number and verifies that the number is valid within the Department of Homeland Security's database. If the citizenship question is left blank, the application is rejected.

Once a claim has been approved, IDES mails a finding to the claimant detailing his benefits and instructing him to call the IDES phone system, Tele-Serve. IDES also mails a confirmation number that is required to certify eligibility. In order for the claimant to receive his next check, he must call Tele-Serve on a biweekly basis, verify

his identification, and certify his continuing eligibility for unemployment benefits. The first time a claimant calls Tele-Serve he is required to create a personal identification number (PIN), which is used as an electronic signature every time he calls thereafter. A claimant enters his social security number and PIN to access the certification menu within Tele-Serve. He then provides his confirmation number or answers a series of questions to certify continuing eligibility. Proper certification allows a claimant to collect his next biweekly payment.

Beginning in 2001, Angelica Vasquez assisted illegal immigrants in obtaining unemployment benefits. These immigrants provided their information to Vasquez either directly, by telephone, or through an intermediary. Among the information provided, the immigrants gave Vasquez social security numbers they had unlawfully obtained so they could work within the United States. As her clients were undocumented workers, Vasquez was aware that these social security numbers were "bad." Vasquez charged $80 for completion of each application. Her boyfriend, Demetrio Barajas, would often meet with the illegal immigrants and accept information and payments on Vasquez's behalf. Vasquez did not inquire if the claimants were United States citizens, had valid social security numbers, or were legally permitted to work in the United States. Nor did Vasquez request documentation or a signature from the claimants. Often the claimants never signed or even saw their applications.

Vasquez had an arrangement with an IDES employee, James Snell, to process these falsified applications. Vasquez would drop off the completed applications with Snell, who would then input the data and approve the payment of benefits. If the citizenship question on the applications was left blank, Snell would input the answer "yes" into the computer. He would process these applications without the claimant present and without any proof of identification. On occasion, Vasquez would treat Snell to lunch or buy him a bottle of gin as payment for his services.

After benefits were approved, the illegal immigrants would receive a letter in the mail containing a confirmation number. They would provide this number to Vasquez or Barajas. Vasquez would call Tele-Serve, set up a PIN for each claimant, and use the confirmation number provided by the claimant to certify ongoing eligibility for unemployment benefits. The claimants continued to provide confirmation numbers to Vasquez each time they received a new check. As payment for her services, Vasquez received the entirety of the second benefits check from each claimant. Again, Barajas often received these payments on behalf of Vasquez. If a claimant failed to pay, Vasquez would reroute the checks to a different address.

In December 2007, IDES promoted Snell, who informed Vasquez that he would no longer be able to process unemployment insurance applications. Shortly thereafter, Vasquez ceased helping illegal immigrants collect unemployment benefits and began working full-

time as a dispatcher at Roto-Rooter. In October 2008, following an extensive investigation at Snell's IDES branch, Vasquez was interviewed by federal authorities and arrested for her role in a scheme to defraud IDES. On April 8, 2010, a grand jury returned a superseding indictment charging Vasquez with nine counts of mail fraud and one count of forfeiture. The superseding indictment alleged that Vasquez devised and participated in a scheme to defraud IDES and to obtain money through materially false and fraudulent representations, resulting in an IDES loss of over $700,000 in unemployment benefit payments to ineligible claimants. Each count alleged delivery by U.S. mail of IDES unemployment payments to an ineligible claimant. On June 17, 2010, a jury convicted Vasquez of eight of the nine counts of mail fraud.

On January 6, 2011, Vasquez was sentenced to 96 months' imprisonment and ordered to pay restitution in the amount of $724,596. During the sentencing hearing, the district judge asked defense counsel if he had any objections to the PSR, to which defense counsel replied, "No, your honor." The PSR included four sentencing guideline enhancements and calculated a total offense level of 33. As a defendant with no prior convictions, the advisory sentencing range was calculated at 135 to 168 months. The district judge found the guidelines to be "unnecessarily harsh" in Vasquez's case and lowered the sentence to 96 months. Vasquez now challenges the district court's application of three sentencing guideline enhancements.

## II. ANALYSIS

*A. Standard of Review*

Before reviewing the application of the sentencing guidelines, we must first determine the appropriate standard of review. The government argues that defense counsel's failure to object to the PSR constitutes waiver of Vasquez's argument on appeal. In contrast, Vasquez argues that her objections to the sentencing enhancements were merely forfeited. "Forfeiture takes place when counsel or a defendant negligently bypasses a valid argument." *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010). Waiver, on the other hand, involves an intentional abandonment of a known right, *id.*, and precludes all appellate review on that issue, *United States v. Turner*, 651 F.3d 743, 747 (7th Cir.), *cert. denied*, 132 S. Ct. 863 (2011). "Where the government cannot proffer any strategic justification for a decision, we can assume forfeiture." *Anderson*, 604 F.3d at 1001-02. If we determine that the defendant forfeited an argument, we review only for plain error. *Id.* at 1002.

"Our duty when considering waiver is to divine from the record an intent to forego an argument." *United States v. Rodriguez-Gomez*, 608 F.3d 969, 972 (7th Cir. 2010). Waiver is to be construed liberally in favor of the defendant. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005). In this case, the government argues that Vasquez intentionally abandoned her right to challenge the application of the sentencing enhancements by choosing instead to focus on the mitigating factors of her case. At sentencing, defense counsel argued for

a below-guidelines sentence by highlighting several mitigating factors. For instance, counsel noted that the illegal immigrants who were involved in the scheme previously held jobs and paid taxes. In addition, counsel downplayed Vasquez's knowledge of the immigrants' undocumented status. The government alleges that Vasquez strategically chose not to challenge the sentencing enhancements in the PSR to avoid discussion of the aggravating factors of her offense. Perhaps sympathetic to Vasquez's mitigating factors, the district court departed from the guidelines and lowered Vasquez's sentence from 135 months to 96 months.

Vasquez argues that there was no strategic reason for failing to raise objections to the sentencing enhancements. The three enhancements increased Vasquez's offense level by ten. Challenging these enhancements would not have prevented defense counsel from presenting a mitigation argument. Moreover, Vasquez notes that many of defense counsel's arguments during sentencing were erroneous.

Ultimately, it does not matter whether we find waiver or forfeiture as Vasquez's argument still fails under plain error review. *Accord United States v. Lewis*, 597 F.3d 1345, 1347 (7th Cir. 2010).

## B. Sentencing Guidelines

Under plain error review, the court reverses only when there is: "(1) an error or defect (2) that is clear or obvious (3) affecting the defendant's substantial rights (4) and

seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *Anderson*, 604 F.3d at 1002. Vasquez challenges the application of three sentencing enhancements, which we address separately.

### 1. *Organizer or Leader*

The district court applied a four-level enhancement to Vasquez's sentence under § 3B1.1(a) of the United States Sentencing Guidelines. Under this section, a defendant's sentence may be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (2009).[1] A "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1 cmt. n.1. The defendant must have organized or led one or more participants. *Id.* § 3B1.1 cmt. n.2.

"The 'central concern' of § 3B1.1 is the defendant's relative responsibility for the commission of the of-

---

[1] Vasquez's original sentencing hearing was to be held on September 21, 2010. Accordingly, the PSR applies the 2009 sentencing guidelines. But Vasquez's sentencing hearing did not take place until January 2011. At that time, the 2010 sentencing guidelines would have been in effect. *See* U.S.S.G. § 1B1.11(a). Because the specific guidelines applied to Vasquez's sentence are identical in the 2009 and 2010 versions, we find no error in the district court's reliance on the 2009 guidelines as applied in the PSR.

fense." *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009). The court considers factors such as the defendant's decision-making authority, nature of participation, recruitment of accomplices, "claimed right to a larger share of the fruits of the crime," role in planning and organizing, scope of illegal activity, and control and authority exercised over others. U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Knox*, 624 F.3d 865, 874 (7th Cir. 2010). In order to apply a § 3B1.1(a) adjustment to a defendant's sentence, "the defendant must have exercised some degree of control over others involved in the commission of the offense *or* he must have been responsible for organizing others for the purpose of carrying out the crime." *Knox*, 624 F.3d at 874.

Vasquez contends that the four-level adjustment was improper because she did not have control over and did not organize the individuals who came to her for assistance. Vasquez likens her case to *United States v. Reneslacis*, 349 F.3d 412 (7th Cir. 2003). In *Reneslacis*, the defendant referred people seeking immigration papers to an undercover agent who, for a bribe, would tender the papers and provide a kickback to the defendant. *Id.* at 414. We found that the defendant did not act as a leader because the individuals he referred to the undercover agent were merely customers, not subordinates subject to his control. *Id.* at 417. In addition, the defendant was not an organizer because there was no common criminal objective; "everyone whom Reneslacis worked with had their own agenda . . . making it impossible to say that Reneslacis was organizing them for *concerted* action." *Id.* at 418. We held that the defendant's actions

were similar to those of a narcotics broker, to whom the four-level adjustment under § 3B1.1(a) does not apply. *Id.* (*citing United States v. Schuh*, 289 F.3d 968, 973 (7th Cir. 2002)).

Vasquez's case differs significantly from *Reneslacis*. Vasquez did not merely refer customers to Snell at the IDES office. Instead, Vasquez exercised near total control over the entire scheme. She received payment up front to fill out the unemployment insurance applications—which then remained in her sole possession until she turned them over to Snell. She recruited others to help in her efforts, including her boyfriend Barajas. After benefits were awarded, she was responsible for calling Tele-Serve to certify continuing eligibility. Vasquez created a PIN for each claimant and had the ability to reroute checks if she was not compensated. Through these payments, which were paid directly to her or Barajas, Vasquez received a large share of the proceeds of the criminal activity. Thus, she shared a common interest with her clients in seeking unemployment benefits. Finally, there is sufficient evidence to find that five or more participants (including Vasquez, Barajas, Snell, and numerous undocumented immigrants) were involved in the criminal activity alleged. In light of these facts, the district court properly considered Vasquez to be an organizer or leader and did not err in applying § 3B1.1(a).

### 2. Identity Theft

The district court also applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C)(i) (2009). This section

applies if the defendant's offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *Id.* Congress enacted this section as a deterrent to "affirmative identify theft" or "breeding." *Id.* § 2B1.1 cmt. background. In these types of cases, "a defendant uses another individual's name, social security number, or some other form of identification . . . to 'breed' (*i.e.*, produce or obtain) new or additional forms of identification." *Id.* As an example, if a defendant obtains a bank loan by unlawfully using another's name and social security number, the bank account number is considered the "other means of identification" and the sentencing enhancement applies to the defendant's conduct. *Id.* § 2B1.1 cmt. n.9. Similarly, if a defendant uses another's name and address to obtain a credit card in that individual's name, the enhancement applies. *Id.* In contrast, the enhancement does not apply to a defendant who merely uses a stolen credit card or forges a signature to cash a stolen check. *Id.*

Means of identification is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," 18 U.S.C. § 1028(d)(7), except such means "shall be of an actual (*i.e.*, not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable . . . ." U.S.S.G. § 2B1.1 cmt. n.1. A means of identification as defined in § 1028(d)(7) may include an "access device," the definition of which includes a "personal identification number . . . that can be used . . . to obtain money, goods, services, or any other thing

of value, or that can be used to initiate a transfer of funds." 18 U.S.C. § 1029(e)(1).

Vasquez acknowledges that actual individuals' social security numbers were used unlawfully as the first means of identification. At issue is whether the PINs created for purposes of accessing the Tele-Serve system may be considered the "other means of identification." Vasquez argues that the PINs do not meet the guideline definition since each PIN only served to identify the benefits claimant himself. In other words, no actual individual, other than the claimant, was identified by the PIN.

A claimant's PIN is obtained by calling Tele-Serve and inputting one's social security number. A social security number is all that is required. The PIN is then used in conjunction with the claimant's social security number to access Tele-Serve each time the claimant calls in to verify continuing eligibility. Claimants are warned to safeguard their PIN since it has the same legal effect as a signature on a paper document. IDES personnel do not have access to each claimant's PIN.

We agree with the district court that the PIN is a "number that may be used . . . to identify a specific individual." 18 U.S.C. § 1028(d)(7). But does the PIN identify an actual individual other than the defendant (or in this case, the unlawful claimant) within the meaning of U.S.S.G. § 2B1.1? We believe it does. Under the IDES system, a claimant's PIN is linked to an individual's social security number. Both are required to access Tele-Serve, and the social security number is required to

create the PIN. IDES uses a claimant's social security number to track the payment of benefits within its system. Accordingly, when a PIN is created through the unlawful use of an actual individual's social security number, that PIN represents an additional means of identification linked to that actual individual.

The fact that the claimants used their own names and other personal information on their applications does not change our analysis. Other courts examining cases in which social security numbers of actual individuals were paired with new photographs or names have held that these "hybrid" means of identification still qualify for the sentencing enhancement. *See, e.g.*, *United States v. Newsome*, 439 F.3d 181, 185-86 (3d Cir. 2006) (alteration of existing means of identification by changing the photograph created a "hybrid" means of identification subjecting the defendant to a two-level enhancement); *United States v. Williams*, 355 F.3d 893, 900 (6th Cir. 2003) (enhancement applied to defendants who obtained bank loans by using their actual names with others' social security numbers). Here, the PIN was affiliated with an actual individual's social security number as well as the claimant's personal information. This link between the PIN and the claimant's personal information does not sever the tie that remains between the PIN, social security number, and victim. *See United States v. Melendrez*, 389 F.3d 829, 835-36 (9th Cir. 2004) (using fictitious names on identification documents does not sever the link between the victim and his social security number).

We find that the district court did not plainly err in applying a two-level means of identification enhancement to Vasquez's sentence.

### 3. *Number of Victims*

Finally, Vasquez's sentence included a four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) (2009), which applies if a defendant's offense involved fifty or more victims. A "victim" is anyone who sustained actual loss or bodily injury, or "any individual whose means of identification was used unlawfully or without authority." *Id.* § 2B1.1 cmt. n.1, 4. Vasquez argues that the enhancement should not apply because only nine victims were involved. In support of this argument, Vasquez notes that she was charged with committing only nine counts of mail fraud and only one social security number was used in each of those discrete offenses.

We reject Vasquez's reasoning. Vasquez engaged in a scheme involving numerous participants over the course of seven years. The government produced evidence of approximately seventy-two claimants who used unlawfully obtained social security numbers in applying for benefits with Vasquez's assistance. These social security numbers represent the victims whose means of identification were used illegally.

Vasquez was charged with nine counts of mail fraud. A scheme to defraud is required to establish mail fraud. *See* 18 U.S.C. § 1341 ("Whoever, *having devised or intending to devise any scheme or artifice to defraud* . . . places in

any post office . . . any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than 20 years, or both." (emphasis added)). Thus, the nine counts of mail fraud represent Vasquez's use of the Postal Service to execute her unemployment benefits scheme. Because the entire scheme is an element of the crime, the district court did not err in considering all of the victims involved in the scheme instead of only the nine victims associated with Vasquez's use of the Postal Service. *See United States v. Boone*, 628 F.3d 927, 934 (7th Cir. 2010) ("[A] mailing in furtherance of a scheme to defraud is simply the element that confers federal jurisdiction under the mail fraud statute.").

### III.  CONCLUSION

We hold that it was not plain error for the district court to apply the sentencing guideline enhancements set forth in the PSR to Vasquez's sentence and thus AFFIRM.